# In the United States Court of Federal Claims

No. 09-704
(Filed: July 27, 2010)

* * * * * * * * * * * * * * * * * * * * * * * *

DALE A. GILBRETH,

     *Plaintiff,*

v.

THE UNITED STATES,

     *Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * *

Military Pay; Disability Retirement; Board for Correction of Military Records; 28 U.S.C. § 2501; Accrual of Claim

   *Jason E. Perry*, Cheshire, Connecticut, for plaintiff.

   *William J. Grimaldi*, Civil Division, Department of Justice, Washington, DC, for defendant, with whom were *Steven J. Gillingham*, Assistant Director, *Jeanne E. Davidson*, Director, and *Tony West*, Assistant Attorney General, all on behalf of the Department of Justice. *David F. Brash*, United States Air Force, Of Counsel.

———————

## OPINION

———————

BRUGGINK, *Judge*.

   This is an action for disability retirement pay. Plaintiff, Dale Gilbreth, voluntarily separated from the United States Air Force ("Air Force"). Later he unsuccessfully sought correction of his records to reflect that physical impairments which manifested themselves while he was on active duty warranted disability retirement. Pending is defendant's motion to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") as well as the parties' cross-motions for judgment on the administrative record

pursuant to RCFC 52.1.  The motions are ready for disposition.  We held oral argument on June 3, 2010.  For the reasons set forth below, we grant defendant's motion for judgment on the administrative record.

BACKGROUND[1]

Enlisting in the Air Force in 1983, Mr. Gilbreth received his officer's commission in August 1989.  After commissioning, he was an Air Weapons Director onboard an Airborne Warning and Control System aircraft.  In 1991, he participated in missions as a part of Operation Desert Storm.  During those missions, he participated in search and rescue operations in Iraqi airspace. Defendant does not dispute that those missions led to Mr. Gilbreth's subsequent post-traumatic stress ("PTSD") and somatoform disorders, although it contends that these conditions did not manifest themselves prior to his separation.

The Air Force took  Mr. Gilbreth off flight status from December 2 to 23, 1991, from September 17 to October 6, 1992, and from November 4 to 12, 1992.  Contemporaneous medical documentation indicates that during this time he was experiencing upper respiratory infections ("URIs") and knee pain.

In February 1992, Mr. Gilbreth requested separation under an incentive program which paid a lump-sum benefit.  *See* 10 U.S.C. § 1175 (2006).  The Air Force granted his request and set December 31, 1992, as the effective date. Prior to separation, Mr. Gilbreth sought a separation physical.[2]  The exam was scheduled for November 17, 1992, although the record does not confirm that it took place nor does it contain the results of that exam.  Defendant does not, however, dispute that the exam took place.  As scheduled, the Air Force moved forward with separation on December 31, 1992. Because Mr. Gilbreth performed his duty satisfactorily in the previous twelve months, the Air Force

---

[1] The facts are drawn from the administrative record ("AR").  Plaintiff moved to include additional documents in the record.  Defendant did not object so they are admitted as AR pages 186-204.

[2] AR 20.

presumed him fit for separation under its "Medical Examinations and Standards."[3]  Mr. Gilbreth never again served on active duty status.

After his separation, the Air Force placed Mr. Gilbreth in the Individual Ready Reserve ("IRR"), a non-obligating, non-participating status.  While in IRR, Mr. Gilbreth filed several claims for disability pay with the Department of Veteran's Affairs ("VA").  In 1994, the VA assigned him a disability rating of 30% based on his somatoform disorder and PTSD.  The VA also gave him a 10% disability rating for tinnitus.  It denied compensation based on URIs, finding he had no symptoms.  Later, the VA increased his PTSD rating to 100%, effective December 10, 1999.

On January 1, 1996, the Air Force transferred Mr. Gilbreth from IRR to the Standby Reserve, Inactive Status List Reserve Section ("ISLRS"). While in that status, Mr. Gilbreth petitioned the Air Force Board for Correction of Military Records ("AFBCMR") for reinstatement to active duty to compensate him for "illegal taxation [resulting in] a breach of the Special Separation Benefit (SSB) contract [he] voluntarily separated under."[4]  In addition, because the results of his November 17, 1992 separation physical were missing, he sought another physical for the purpose of determining whether, at the time of separation, he was fit for duty.

The AFBCMR referred his petition to its Chief Medical Consultant, Dr. Frederick Hornick.  Dr. Hornick recommended denying the petition, noting that "while the applicant was treated for some ordinary medical problems while on active duty . . . none of these problems singly, nor any combination of them, was of sufficient severity to justify a finding of unfit."[5]  Dr. Hornick was not troubled by the absence in the record of the results of the separation

---

[3] AR 112.

[4] AR 3-4.

[5] AR 83.

physical because, "[l]oss of the [the November 17, 1992 physical] would seem to have little bearing on his claim of service-connected disability . . . ."[6]

Mr. Gilbreth was given an opportunity to respond to Dr. Hornick's report, which he did. The AFBCMR denied Mr. Gilbreth's petition on September 4, 1998, stating that he failed to warrant a disability discharge because, at the time of separation, he remained medically qualified for active duty.[7]

In July 2003, the Air Reserve Personnel Center ("ARPC") screened Mr. Gilbreth, as it does all officers who have been on ISLRS status for more than three years. Mr. Gilbreth was given the option to resign his commission or to have an administrative discharge board consider whether to retain him on ISLRS status based on a medical review.[8] Mr. Gilbreth requested an administrative board pursuant to the Disability Evaluation System ("DES"). On February 6, 2004, ARPC Fitness Review Panel recommended that ARPC find Mr. Gilbreth medically unfit for duty and discharge him. The panel recommended discharge because of the "severity and Service-connected origin" of his PTSD.[9]

Notwithstanding his imminent discharge, Mr. Gilbreth nevertheless pursued his desire to enter into the DES and obtain review by an evaluation board.[10] All Reservists may enter the DES process, but the process is predicated on evaluation of injuries incurred either during active duty or

---

[6] AR 82.

[7] Contrary to his current assertion, the Board clearly was aware of his response to the medical consultant report, but chose not to credit it. AR. 2.

[8] AR 110.

[9] AR 143.

[10] AR 161.

during active reserve service.[11]   On June 3, 2004, an Informal Physical Evaluation Board ("IPEB") found plaintiff unfit for retention in the inactive reserves but noted that he "provided no documentation of in-service manifestation of PTSD."[12]   The IPEB suggested that Mr. Gilbreth consider submitting whatever evidence he had of in-service injury to the AFBCMR.

Mr. Gilbreth did not petition the AFBCMR.  Instead, he requested a Formal Physical Evaluation Board ("PEB").  One was initially scheduled for August 4, 2004, but ARPC canceled it, noting that the "case [could] not be adjudicated through the disability eligibility system" because Mr. Gilbreth's medical problems were not the result of his reserve service.[13]

Following cancellation of the PEB, Mr. Gilbreth filed a complaint with the Inspector General ("IG") of the Air Force Personnel Center ("AFPC").  He asserted that the Air Force denied him due process by not granting him a PEB.  The IG determined that the complaint was within the purview of the AFPC's Directorate of Personnel Programs and sent the complaint there on September 7, 2004.  Col. Maurmann, Director of Personnel Program Management, handled Mr. Gilbreth's complaint.  Col. Maurmann rejected Mr. Gilbreth's request, writing that, due to his inactive status, the DES process would be limited to a determination of whether he was fit to continue inactive service.[14]  It could only be used to evaluate a service-connected disability if the disability manifested itself during active service.  Col. Maurmann advised Mr. Gilbreth to pursue the only forum—the AFBCMR—that could order disability retirement by reevaluating the timing of his PTSD.

Once again, Mr. Gilbreth chose not to petition the Board.  On October 18, 2004, he responded to the IG.  In his letter, Mr. Gilbreth explained his

---

[11] AR 158.

[12] AR 159.

[13] AR 158.

[14] AR 126.

understanding that resort to a PEB was a prerequisite to petitioning the AFBCMR. Col. Maurmann responded on October 18th, explaining again that the AFPC would not order a PEB and urging him to seek relief from the AFBCMR. Instead, in January 2005, Mr. Gilbreth asked his congressman, John Boozman, to intervene.

Though the record does not indicate clearly what events prompted the AFBCMR to take up Mr. Gilbreth's request, it met in early 2006 to consider whether his PTSD warranted disability retirement, i.e., whether it had manifested itself during a period of active service. The Board sought the advisory opinion of Dr. Gregory Rehe, its Medical Consultant. He recommended that the AFBCMR deny Mr. Gilbreth disability retirement. Dr. Rehe examined Mr. Gilbreth's records to see whether PTSD had been diagnosed and, if it had been, whether it affected job performance. He found no indication of a diagnosis of PTSD prior to separation. He made reference to Mr. Gilbreth's own 1992 medical history form listing no medications, showing a cold as the only illness, and characterizing his health as excellent.[15] Dr. Rehe also relied on Mr. Gilbreth's first application to the VA in which he lists the following medical problems encountered while on active duty: colds, mononucleosis, hyper-extended knee, tendinitis, ear blockage, left ear drum rupture, viral gastroenteritis, bronchitis, URIs, and muscle strain. PTSD was not listed, and none of the other problems warranted a Medical Evaluation Board, in Dr. Rehe's opinion.

Given an opportunity to respond to Dr. Rehe's advisory opinion, Mr. Gilbreth argued that, though PTSD was not specified in the records, it was implicit in the frequency of his pre-separation URIs. He further argued that the absence in the record of his pre-separation physical's results was prejudicial. On June 8, 2006, the AFBCMR adopted Dr. Rehe's recommendation and concluded that Mr. Gilbreth was fit for continued military service when he separated in 1992. The Air Force then honorably discharged Mr. Gilbreth from inactive service on July 10, 2006.

---

[15] AR 162-63. A copy of that medical form is not in the record, however.

DISCUSSION

I.  Jurisdiction

The Tucker Act grants this court jurisdiction to hear claims for money founded upon acts of Congress.  28 U.S.C. § 1491 (2006).  In support of his claim, plaintiff relies on 10 U.S.C. § 1201(a), which authorizes disability retirement pay for personnel who incur physical disabilities during active service.  The Federal Circuit has held this code provision to be money-mandating.  *See Chambers v. United States*, 417 F.3d 1218, 1223 (2005). We thus have subject matter jurisdiction.

With respect to money claims against the United States, an element of jurisdiction is that the claim must be timely.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008).  Defendant's rationale for dismissal under RCFC 12(b)(1) is that the claim is untimely.  Our general limitations statute, 28 U.S.C. § 2501, applies here.  Thus, plaintiff had to initiate the suit within six years after his claim accrued.  Defendant argues that the statute of limitations began to run on December 31, 1992, the day plaintiff voluntarily separated without disability retirement, or, at the latest, September 4, 1998, the date of the first AFBMCR decision.  Plaintiff argues that the statute began to run on June 8, 2006, the date of the AFBCMR's second decision.

A claim first accrues "when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."  *Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966).  Military disability retirement claims generally accrue when the appropriate military board denies or refuses to hear the claim, the first competent board rule.  *Chambers*, 417 F.3d at 1226.  During active service, the disability board—the PEB here—decides disability claims.  A military disability retirement claim typically accrues at the end of active duty if the disability board denies the claim before separation.  *Id.* at 1226.  It can also accrue at the time of separation if, at that time, the servicemember has "sufficient actual or constructive notice of his disability" and yet fails to demand a hearing before the disability board.  *Real v. United States*, 906 F.2d

7

1557, 1561-63 (Fed. Cir. 1990).  Where, however, the servicemember has not been considered or rejected for disability retirement prior to leaving active service, the servicemember must go to the AFBCMR in order to pursue disability retirement.  In that circumstance, the AFBCMR becomes the first competent board to rule on the issue.  *Chambers,* 417 F.3d at 1225.

When considering a RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, we accept undisputed allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.  *See United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 86 Fed. Cl. 183, 186 (2009).  Despite these presumptions, once the court's subject matter jurisdiction is challenged pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002).  To establish jurisdiction, plaintiff relies on the administrative record, as does defendant.  The court may consider the administrative record when addressing a 12(b)(1) motion.  *See Clifton v. United States*, 31 Fed. Cl. 593, 596 (1994).

Plaintiff contends that the relevant date here is that of the second AFBCMR decision in 2006, because there was no pre-separation decision by a PEB.  He recognizes that he applied to the AFBCMR in 1996, and that it issued a decision in 1998 rejecting his claim; even so, he contends that the board *sua sponte* reopened his case and issued its final decision in 2006, within the six year limitations period. As discussed below, if the board reopens a prior decision, the second decision becomes the final one for purposes of claim accrual.

Defendant acknowledges that the Air Force did not deny Mr. Gilbreth disability retirement prior to separation.  It argues, however, that because plaintiff now contends he believed himself to be disabled prior to separation, he had to pursue disability retirement at that time.   Not having demanded a hearing before an evaluation board, Mr. Gilbreth's claim accrued when he separated, according to defendant.  In other words, defendant relies on a decision that was not but could have been made by the Air Force prior to Mr. Gilbreth's separation.  It relies for legal support on the Federal Circuit's opinion in *Real*,  906 F.2d at 1557.

In *Real*, the trial court acknowledged a line of decisions holding that "the limitations period did not begin to run upon the service member's discharge because of the lack of sufficient knowledge of the member's condition at that time." *Id.* at 1561. The trial court confined those decisions to situations involving disabilities unknown to both the servicemember and the military. *Id.* The trial court looked only for a minimal level of knowledge, reasoning that the servicemember knew he had mental irregularities prior to separation and holding his action accrued at separation. *Id.* at 1562-63. On appeal, the Federal Circuit concurred that, if the servicemember has sufficient actual or constructive notice of his disability and thus his entitlement to disability retirement, the failure to request a hearing board prior to discharge triggers the statute of limitations. *Id.* at 1562. The Federal Circuit reversed and remanded, however, because the trial court failed to measure the servicemember's knowledge in light of the particular requirements of Section 1201. *Id.* The court found that there was "no indication in the record before this court that Real could (let alone should) have known that he was suffering from a permanently disabling disorder in 1974." *Id.* at 1563; *see also Chambers*, 417 F.3d at 1218.

Under Section 1201, a servicemember must suffer from a permanent disability manifesting prior to the end of active service. 10 U.S.C. § 1201(b)(1)-(2). Servicemembers with less than twenty years of active service must have a disability rating of at least 30% under the VA's schedule of ratings. *Id.* Mr. Gilbreth's claim therefore accrued on December 31, 1992, only if he knew or should have known at that time that he suffered from a permanent disability rated at 30% or more. For the reasons stated below, the record does not permit us to conclude that he had the requisite knowledge.

Defendant cites to statements Mr. Gilbreth made in 1996 about his condition prior to separation: "I informed the hospital staff that these conditions were a result of changes in my well being and . . . the conditions certainly existed. I knew at the time I was having some problems and specifically requested this separation physical to properly address those

problems."[16]  It is unclear from the context of this statement, however, to what condition plaintiff is referring.

In addition, defendant points to statements in the complaint which also indicate pre-separation knowledge:   Mr. Gilbreth "requested a separation physical due to concerns about the increasing occurrence and severity of [URIs],"[17] and that his "condition failed Air Force retention standards and should have resulted in referral to a Medical Evaluation Board."[18]   The statements do not show that Mr. Gilbreth knew he had a permanently disabling condition.  Mr. Gilbreth expressed concern about symptoms, nothing more.

The record also fails to support a conclusion that he knew prior to separation that the URIs were both permanent and disabling.   Prior to separation, Mr. Gilbreth knew only that the URIs were increasing in both number and severity.  In particular, sinusitis,[19] which appears to have caused his URIs, only reaches the requisite severity level as a result of three or more incapacitating episodes or more than six non-incapacitating episodes.  38 C.F.R  § 4.97 (2006).  Over a one-year period, the Air Force forbade Mr. Gilbreth from flight duties three times.  The short length of the groundings also suggests that the URIs were not incapacitating, as that requires four to six weeks of treatment.  *Id.*  As non-incapacitating episodes, this number falls below the six episodes required.  He did not have sufficient knowledge to warrant treating his separation as equivalent to a knowing failure to assert an entitlement to disability retirement.  Mr. Gilbreth's claim thus did not accrue on December 31, 1992.

In the alternative, defendant suggests that the claim accrued no later than September 8, 1998, the day the AFBCMR initially denied Mr. Gilbreth's

---

[16]AR 19.

[17] Pl. Compl. ¶ 8.

[18] *Id.*

[19] AR 163.

application to correct his records.  Plaintiff argues that this board did not consider disability retirement: "[Mr. Gilbreth] made no specific demand for disability retirement . . . ."[20]  Thus, plaintiff says, this is not the first competent board to rule on his disability request.  Mr. Gilbreth's application to the Board shows otherwise: "I also request a USAF Medical Review Board to review my USAF and VA medical records to determine if disability retirement or disability discharge [separation] is required in accordance with 10 USC Chapter 61."[21]   Therefore, Mr. Gilbreth's claim accrued no later than September 8, 1998, unless, as plaintiff contends in the alternative, that the first AFBCMR decision was not final because the board *sua sponte* reopened the matter in 2006.

Though filing subsequent appeals to the corrections board will not usually toll a plaintiff's claim, *see Van Allen v. United States* 70 Fed. Cl. 57, 63 (2006), if the "armed service itself reopens the case," the previous board's action is not final.  *Friedman v. United States*, 310 F.2d 381, 396 (Ct. Cl. 1962); *see also Bricker v. United States*, 36 Fed. Cl. 589, 591 (1996).  Hence, a servicemember's claim would not accrue until the new board issues a final decision.  Plaintiff argues that the AFBCMR's June 2006 decision serves as the accrual date here because he did not request another AFBCMR.  Defendant counters that the AFBCMR did not "*sua sponte* reopen Mr. Gilbreth's claim."[22]   In particular, defendant points to Mr. Gilbreth's request to Congressman Boozman as the reason the AFBCMR reopened the case.

An applicant typically files a Department of Defense Form 149 to request review by a corrections board.  The record does not show that Mr. Gilbreth filed a Form 149 subsequent to the 1998 AFBCMR decision.  As we found earlier, the record does not indicate why the Board reconvened to consider Mr. Gilbreth's circumstances.   We note, however, that his

---

[20] Pl. Cross-Mot. for J. on the AR, at 6.

[21] AR 4.

[22] Def.'s Reply to Pl. Opp'n to Def.'s Mot. to Dis. and J. Upon the AR, at 7.

correspondence with the AFPC prompted Col. Maurmann to suggest on two occasions that Mr. Gilbreth file a petition with the Board.  Mr. Gilbreth had received the same advice from the IPEB.  When the AFBCMR subsequently took up his case, Mr. Gilbreth emphasized that he had not initiated the petition.  Instead, he again desired referral to a PEB.[23]

Under the circumstances, we believe it is most likely that someone other than Mr. Gilbreth referred the matter to the AFBCMR.  We believe this is tantamount to a *sua sponte* reopening.  Thus, we conclude that the Board's 2006 decision was the first final decision by a competent board. Hence, plaintiff's claim is timely.

## II. Standard For Judgment on the Administrative Record

The Secretary of the Air Force, acting through a board of corrections for military records, "may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).  To remedy an error or injustice, the board may pay claims for loss of pay or other pecuniary benefits.  *Id.* § 1552(c)(1).  The AFBCMR has the power to award a disability rating and to grant pay for that disability.  *See id.*  § 1552(a)(1).

A military determination of medical disability is subject to a limited review before this court.  "[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province . . . courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."  *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983).  It is sufficient to sustain the decision below if it is not arbitrary, capricious, unsupported by substantial evidence, or contrary to law.   *See Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998).  In particular, we do not reweigh the evidence in an attempt to determine whether Mr. Gilbreth warranted disability retirement when he separated on December 31, 1992.  Rather, we determine whether

---

[23] AR 167.

substantial evidence supports the AFBCMR's conclusion that Mr. Gilbreth was fit for continued service when he separated.  *See Heisig*, 719 F.2d at 1157.

RCFC 52.1 provides for an expedited trial on a paper record, allowing this court to conduct fact-finding.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005).  The administrative record constitutes that paper record.

III. Mr. Gilbreth's Claims

 Mr. Gilbreth argues that the AFBCMR's 1998 and 2006 decisions denying him disability retirement pay were arbitrary and capricious.  In particular, he argues that the 1998 Board relied on a medical advisory opinion that failed to consider his somatoform disorder, PTSD, and URIs.  He believes that the advisory opinion also documented a pre-separation condition—tinnitus—which required the Board to refer him to a PEB.  The advisory opinion was in error, he contends, when it concluded that the loss of the report of Mr. Gilbreth's pre-separation physical was harmless.  Finally, Mr. Gilbreth also argues that the 1998 Board failed to address his response to the advisory opinion, in which he explained his numerous medical conditions.

With respect to the 2006 Board decision, Mr. Gilbreth argues that it failed to "respond to, acknowledge, or analyze the impact of his URIs and PTSD . . . ."[24]  In addition, he contends that Dr. Rehe's advisory opinion to the board failed to "analyze or explain whether or not Plaintiff was entitled to a Physical Evaluation Board in 2006."[25]

Defendant responds that the 1998 Board's medical consultant properly considered Mr. Gilbreth's somatoform disorder, URIs, and PTSD, finding no chronic unfitting conditions requiring referral. Moreover, defendant argues that the medical consultant "determined from existing medical records that the missing separation physical records could not have supplied evidence of a

---

[24] Pl.'s Cross-Mot. for J. on the AR, at 12.

[25] *Id.*

condition warranting an [evaluation board] in 1992."[26]   Finally, defendant responds that the 1998 board considered Mr. Gilbreth's response to the advisory opinion.  With respect to the 2006 Board decision, defendant argues that "there is no evidence of a nexus between any current disabling condition from which Mr. Gilbreth suffers and his active duty service."[27]  Defendant also responds that Dr. Rehe's advisory opinion sufficiently addressed Mr. Gilbreth's entitlement to an evaluation board.

Section 1201 permits disability retirement pay only if the servicemember incurs a permanent disability while on active duty.  10 U.S.C. § 1201(a)-(b). Personnel who are separated with less than twenty years of service are entitled to a partial disability retirement if they are at least 30% disabled while on active duty.  The VA, on the other hand, compensates servicemembers for any service-connected injuries, regardless of whether the injuries affected their job performance while on active duty.  Thus, the VA's disability determinations are not "binding upon the court nor conclusive on the issue of disability retirement." *Finn v. United States*, 548 F.2d 340, 342 (Ct. Cl. 1977).  In short, unlike the VA, which awards disability compensation if the disability is service-connected irrespective of when the disability manifested itself, the Air Force awards disability retirement only if the disability negatively affects job performance prior to the end of active-duty service.[28]

The AFBCMR tasked the medical consultants during both Boards to determine whether there was sufficient evidence of a medical or mental condition incurred during active-duty manifesting to a degree warranting a disability evaluation board.[29]  Their task was to consider any symptoms

---

[26] Def. Mot. for J. on the AR, at 15.

[27] *Id.* at 18.

[28] AR 164-65.  *See Lechliter v. United States*, 70 Fed. Cl. 536, 546-47 (2006).

[29] AR 165.

occurring before December 31, 1992, and to evaluate the impact of those symptoms on Mr. Gilbreth's job as an Air Weapons Director.

In 1998, Dr. Hornick found, after going through Mr. Gilbreth's medical history, "that while the applicant was treated for some ordinary medical problems while on active duty . . . none of these problems singly, nor any combination of them, was of sufficient severity to justify a finding of unfit."[30] Dr. Hornick found no symptoms suggesting PTSD or somatoform. It was unnecessary for Dr. Hornick to take into account any post-separation manifestation of PTSD and Somatoform disorder.

Mr. Gilbreth argues that the existence of his PTSD was manifested in the URIs, which caused the Air Force to disqualify him from flight duties for at least forty days. He argues that Dr. Hornick erred in failing to account for the effect of those URIs on his job performance.

The record does not support either Mr. Gilbreth's claim of a connection between PTSD and URIs or his claim that the URIs seriously affected his job performance. The record does show that Mr. Gilbreth's URIs predate the events that gave rise to his PTSD. Plaintiff currently contends that events in 1991—which later were determined to be the source of his PTSD—gave rise to his URIs. Conversely, in a 1996 visit to a VA hospital after the VA diagnosis of PTSD, Mr. Gilbreth himself suggests that the URIs and his PTSD are not linked: "[Mr. Gilbreth] states that since 1986, when he developed mononucleosis, he has had an increasing number in [sic] severity of upper respiratory infections . . . ."[31] Moreover, medical documents from 1989 show that URIs caused the Air Force to ground him from flight, also prior to the events in 1991.[32]

_____

[30] AR 82-83.

[31] AR 184.

[32] AR 201-03.

15

Similarly, the record does not support plaintiff's claim that the URIs were serious. Various medical forms show that the Air Force placed Mr. Gilbreth on the do-not-fly-list for over forty days, a fact he relies on to show their severity. Those same medical forms, however, undermine his claim that the URIs were severe. First, the forms affirm that Mr. Gilbreth remained cleared to fly until a date well after his separation.[33]  Second, Mr. Gilbreth sought to end his grounded status and continue flying on several occasions, which indicates his subjective belief that the URIs were not serious.[34]  Third, over-the-counter medications such as Motrin or Robitussin constituted most of his treatment.[35]  Fourth, other mild ailments also prevented him from flying for days at a time—leg pain in November 1992, for instance.[36]  And finally, the medical records characterize his URIs in this manner: "URI=Evid mild."[37] The record thus does not support a connection between the URIs and PTSD[38] or plaintiff's allegation that the URIs were severe.  Consequently, the record supports the medical consultant's opinion that Mr. Gilbreth suffered from only "ordinary medical problems while on active duty."[39]

Plaintiff contends that Dr. Hornick's advisory opinion documented a condition requiring referral to a PEB.  He relies on the following:

---

[33] AR 64.

[34] AR 197.

[35] *See* AR 198.

[36] AR 192.

[37] AR 199.

[38] The complaint suggests the VA found a connection between the URIs and PTSD.  The record does not contain the VA's findings.  Even if the VA did find a connection, the VA's findings do not bind this court. *Finn*, 548 F.2d at 342.

[39] AR 83.

16

His medical record is quite unremarkable for information on significant problems during his service years, but does show a history of tinnitus (ringing in his ears) which can develop in aircrew members secondary to noise exposure in the course of their work. *Other than this* nothing of a chronic unfitting condition can be found.

AR 82 (emphasis added).

Although the final sentence uses the term "unfitting," we do not believe this word is intended to describe Mr. Gilbreth's tinnitus. The discussion and recommendation sections unequivocally state that Mr. Gilbreth "was medically qualified for continued active duty" and "no change in [his] records is warranted."[40] The only reasonable way to read this paragraph is as a conclusion that he had tinnitus, but there was no chronic or unfitting condition, tinnitus or otherwise. We interpret the Dr. Hornick's statement as a reference to an earlier VA decision giving Mr. Gilbreth a 10% disability rating for tinnitus. Not even Mr. Gilbreth's response to the advisory opinion indicates his belief that tinnitus alone was unfitting: "I believe the combination of Tinnitus [and seven other alleged diagnoses] would accumulate to a total VA disability rating of 30 percent or more . . . ."[41] Mr. Gilbreth knew tinnitus alone failed to make him unfit. The medical consultant's imprecise phrasing notwithstanding, the AFBCMR reasonably reached the same conclusion.

Also contrary to Mr. Gilbreth's allegations, the medical consultant adequately addressed the absence of his physical exam:

Applicant contends that his separation history and physical (H&P) would reveal a much different story . . . . He relates that a clinic visit in Nov 92 addresses issues pertinent to his claim for compensation, but those visits reflect only some minor discomfort in a knee . . . . His separation H&P remains

---

[40] AR 83.

[41] AR 93.

17

> absent from records submitted for review, but had anything of importance been noted at that time, it would follow that evaluation prior to separation would have been accomplished. . . . Loss of the separation H&P records would seem to have little bearing on his claim of service-connected disability from what his medical record shows.

AR 82.

Dr. Hornick noted the absence of the exam report and concluded that this did not prejudice Mr. Gilbreth's claims. In coming to that conclusion, he took into account medical visits that were contemporaneous with the separation physical in November 1992. Those visits failed to indicate serious medical problems. Dr. Hornick reasonably surmised that, if the separation physical resulted in questions about Mr. Gilbreth's fitness, the Air Force would have convened an evaluation board to further consider Mr. Gilbreth's fitness. Dr. Hornick noted that because this did not occur, he could conclude that the physical found no medical issues suggesting Mr. Gilbreth lacked fitness. Because Dr. Hornick noted the absence of the physical, looked at contemporaneous documents, and drew logical conclusions, we believe that he adequately addressed the absence from the record of the separation physical.

Finally, the 1998 AFBCMR considered Mr. Gilbreth's response to the medical consultant's advisory opinion: "The facts and opinions stated in the advisory opinions appear to be based on the evidence of record and have not been adequately rebutted by [Mr. Gilbreth]."[42] Mr. Gilbreth's rebuttal centered on what the missing physical would have shown. As shown above, the AFBCMR reasonably concluded that this was not prejudicial. In sum, the AFBCMR's 1998 decision denying Mr. Gilbreth disability retirement was reasonable.

---

[42] AR 2.

18

Mr. Gilbreth also argues that Dr. Rehe's advisory opinion to the 2006 Board failed to "respond to, acknowledge, or analyze the impact of his URIs and PTSD" and it failed to "analyze or explain whether or not Plaintiff was entitled to a Physical Evaluation Board in 2006."[43]  We disagree.  As with the 1998 decision, scant evidence exists in the record of the URIs and PTSD.  Dr. Rehe's advisory opinion nevertheless addresses Mr. Gilbreth's claims:

> The post-service manifestation and progression of PTSD while in civilian status does make the applicant eligible for military disability compensation benefits . . . . [but] [t]he presence of medical conditions that were not unfitting while in service, and were not the cause of separation or retirement, that later progress in severity causing disability resulting in service connected []VA compensation is not an unusual occurrence and is not a basis to retroactively grant military disability discharge . . . .[44]

The advisory opinion analyzed Mr. Gilbreth's medical condition during service and found no proof of impairment.  There is no basis in the record for questioning that finding.

Additionally, the advisory opinion did address the failure to convene a PEB, concluding that this was not error:

> The applicant requested that his case be reviewed by the Physical Evaluation Board, however, even though service connected for purposes of []VA compensation, his condition was unrelated to military service while a Reservist and review by the PEB under these circumstances is for a fitness determination only.[45]

---

[43]  Pl.'s Cross-Mot. for J. on the AR, at 12.

[44]  AR 164-65.

[45]  AR 163.

19

We agree with the Board's reliance on the advisory opinion and its ultimate conclusion that Mr. Gilbreth did not warrant disability evaluation or referral to a PEB either in 1992 or 2006.  The predicate for referral would have been some evidence that his condition was disabling while he was on active duty. The record supports, however, the consultant's observation that the record "does not show evidence of a medical or mental condition while on active duty manifesting to a degree that warranted referral for disability evaluation."[46]  In any event, the AFBCMR had the ability to grant him disability retirement. There could have been no harm to plaintiff because the Board was in a position to grant the relief he desired.

---

[46] AR 165.

CONCLUSION

After reviewing the record, we cannot say either of the AFBCMR's decisions denying Mr. Gilbreth disability retirement pay were unreasonable.[47] Accordingly, we deny plaintiff's cross-motion for judgment on the administrative record, deny defendant's motion to dismiss and grant defendant's motion for judgment on the administrative record. The clerk is directed to dismiss the case. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[47] Finally, Mr. Gilbreth contended at oral argument that federal regulations entitle him to an automatic rating of unfit for his PTSD and that the Board was arbitrary in not addressing those regulations. The Board acted reasonably though it did not address 38 C.F.R. § 4.129. This provision is applied by the VA, not the Air Force. In any event, it entitles a servicemember to no less than a 50 % disability rating if he suffers from a "mental disorder that develop[ed] in service . . . severe enough to bring about the veteran's release from active military service . . . ." This section does not apply to Mr. Gilbreth, even with his PTSD diagnosis. His PTSD did not bring about his separation; he volunteered to separate under the special incentive program.